## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

MATTHEW P. VESTAL,                                    Case No.: 12-05341
                                                      Chapter 7
        Debtor.                                 Hon. Scott W. Dales

_____/

ROBERT SHEARS,

        Plaintiff,

v.
                                                      Adv. Pro. No.: 12-80330
MATTHEW P. VESTAL,

        Defendant.

_____/


## OPINION AND ORDER AFTER TRIAL


### I. INTRODUCTION

Matthew P. Vestal, the *pro se* defendant in this adversary proceeding (the "Defendant"), filed a voluntary petition for bankruptcy relief under chapter 7 on June 4, 2012. On October 1, 2012, Robert Shears (the "Plaintiff"), timely filed an adversary proceeding objecting to the discharge of his claim against the Defendant for an alleged violation of the Michigan Building Contract Fund Act ("MBCFA"), M.C.L. § 570.151, *et seq.*, pursuant to 11 U.S.C. § 523(a)(4),

and seeking a judgment for treble damages, plus costs and attorney fees, pursuant to M.C.L. § 600.2919a.[1]

The court conducted a trial on January 30 and 31, 2014 in Kalamazoo, Michigan.  It has carefully considered Plaintiff's Exhibits 1 through 7 and Defendant's Exhibits A1, A2, B, C, C1, and D through K, which were all admitted by stipulation of the parties.  The court listened to the credible testimony of the Plaintiff and the Defendant and reviewed the Defendant's November 22, 2013 Trial Brief (DN 64).[2]  For the reasons stated in this Opinion, the Plaintiff's complaint to except the debt from discharge under § 523(a)(4)'s defalcation provision, and under § 523(a)(6), shall be dismissed with prejudice.

## II. JURISDICTION AND RELATED MATTERS

The court has jurisdiction over the Defendant's chapter 7 case pursuant to 28 U.S.C. § 1334(a).  That case and this adversary proceeding have been referred to this court by the United States District Court pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

The court also finds that it has constitutional authority to enter a final judgment in this adversary proceeding.  This is not a case in which a bankruptcy trustee is reaching out to augment the estate by seeking a money judgment, but instead is a case that requires the court, at the request of a creditor, to grant declaratory relief determining the extent of a federally-created discharge. *Cf. Waldman v. Stone*, 698 F.3d 901, 918 (6th Cir. 2013) (discussing limits on court's authority to augment estate); *see Onkyo Europe Electronics GMBH v. Global Technovations Inc.*

---

[1] The Honorable Jeffrey R. Hughes conducted most of the pretrial administration of this adversary proceeding. Judge Hughes set forth the issues remaining for trial in the court's June 20, 2013 Third Pretrial Order (the "Third Pretrial Order," DN 46), which the court admitted at trial as Exhibit 1.  Although not alleged in the complaint, the Third Pretrial Order included an additional issue based upon 11 U.S.C. §523(a)(6) for "willful and malicious injury by the debtor to another or the property of another."  Judge Hughes has since retired from judicial service, and the Clerk reassigned the adversary proceeding.

[2] The Defendant did not file a trial brief.  The court's Third Pretrial Order (DN 46) provided that trial briefs were optional.

*(In re Global Technovations Inc.)*, 694 F.3d 705 (6th Cir. 2012) (authority depends largely on relationship of the relief sought to the claims process).

In any event, the parties have acquiesced in the court's entry of a final judgment by failing to object or moving to withdraw the reference. *Executive Benefits Ins. Agency v. Arkinson (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 566 (9th Cir. 2012) ("The waivable nature of the allocation of adjudicative authority between bankruptcy courts and Article III courts is well established."), *cert. granted*, 133 S. Ct. 2880 (U.S. June 24, 2013); *but see Waldman*, 698 F.3d at 918 (suggesting that Article III's structural limits are not waivable).

## III. FINDINGS OF FACT

The court finds the following facts after considering the exhibits admitted at trial and the credible testimony of both witnesses. *See* Fed. R. Civ. P. 52 (applicable in adversary proceedings under Fed. R. Bankr. P. 7052).

In the spring of 2010, the Plaintiff suffered considerable storm damage to his residence in Lawton, Michigan. As a result, several building and construction "canvassers" made sales calls to the Plaintiff's home, competing to secure a contract to make the repairs. One of those canvassers was Chris Landis ("Landis"), a sales agent for Vestal Builders, the Defendant's construction company at the time. After the Plaintiff shopped around, he signed a contract with Vestal Builders, agreeing to allow the company to repair his residence (the "Contract").

The parties differ as to which document represents the final expression of their agreement. The Plaintiff contends that the operative version of the Contract (Exhibit B) required Vestal Builders to start work on or before May 6, 2010; the Defendant contends, however, that the operative version (Exhibits A and A1 together) contains no such requirement.[3] Both versions

---

[3] The parties admitted duplicate exhibits. Exhibit A and A1 are identical to Exhibits 4 and 5, respectively, and Exhibit B is identical to Exhibit 6. For simplicity, the court will only refer to Defendant's Exhibits A, A1 and B.

were allegedly prepared by Landis, but only Exhibit B includes the Plaintiff's signature under the heading "Acceptance of Proposal." The Plaintiff does not dispute that he signed Exhibit A1 — the "Quote"— but points out that he did not sign Exhibit A2  —the "Acceptance of Proposal." He explained that he did not accept the proposal on the day Landis first presented it because he was considering other proposals.  Several days later, according to the Plaintiff, he signed Exhibit B, which included an additional handwritten term that gave him the option to cancel the Contract "if job not started by May 6, 2010."  *See* Exh. B.

The Defendant maintains that Exhibit B is a forgery, relying on the April 21, 2011 Affidavit of Chris Landis in which Landis swears that the handwriting on "Exhibit B" [4] is not his and that the signature is a "forgery."  *See* Exh. E at ¶ 5.

Comparing the preprinted, non-handwritten portions of Exhibits A2 and B, the court notes that they appear to have been prepared on the same business form, as the Defendant testified.   More specifically, he testified that Vestal Builders typically made proposals to customers on multi-page, multi-colored, carbonless business forms that, when filled out, created an original and duplicates for the company's finance and other departments, as well as for the customer.  Exhibits A2 and B appear to have been prepared using the same carbonless business form, and the court infers that the "Terms and Conditions" that appear on the reverse of Exhibit A2 probably also appeared on the reverse side of Exhibit B. This inference finds support in the Defendant's testimony about his company's use of the business form, and from the language on the front page of the form that refers to "conditions," evidently included on the reverse.[5]

---

[4] The court notes, however, there is no "Exhibit B" attached to the Landis affidavit, as admitted. Moreover, although admitted on stipulation, the affidavit is hearsay on the forgery question and therefore of limited value in this proceeding.
[5] It is likely that the court's version of Exhibit B is a one-sided copy of a two-sided original, or a copy of the office's or customer's duplicate that lacked the printing on the reverse.

On or about April 27, 2010, the Plaintiff delivered to the Defendant an insurance company's check in the amount of $21,466.90, payable to the Plaintiff and Vestal Builders, to cover the cost of repairs to the Plaintiff's residence. Upon receipt, Vestal Builders tendered back to the Plaintiff two checks admitted as Exhibits F and G, totaling $12,821.00. It retained $8,645.90, equaling roughly one third of the price of the project as a security deposit for the cost of the work (the "Security Deposit"). Vestal Builders deposited these funds into its checking account, waiting for the credit union's seven-day hold on funds availability to expire.

Vestal Builders placed orders with two vendors for windows and siding to be used to repair the Plaintiff's residence. *See* Exh. C and C1. Exhibit C shows an order date of 5-5-10 and an expected delivery date of 5-13-10, while Exhibit C1 shows no order date but has an expected delivery date of 4-22-10.[6] The Defendant testified that he prepaid for the windows and siding when ordering the goods. Although Exhibits C and C1 do not support this testimony, the court does not doubt that Vestal Builders ordered the goods approximately one week before the supposed May 6, 2010 deadline reflected on Exhibit B.[7]

On May 7, 2010, before Vestal Builders could install these items at the Plaintiff's residence, the Plaintiff cancelled the Contract in writing, and requested that Vestal Builders return the Security Deposit. *See* Exh. H (the "Cancellation Letter"). Curiously, the Plaintiff testified that Kevin Block ("Block," another Vestal Builders sales agent) drafted the Cancellation

---

[6] The court notes that the delivery date reflected on Exhibit C1 is handwritten, and implausibly predates the date the parties exchanged the $21,466.90 insurance check for the two checks reflected on Exhibits F and G. At trial, the Defendant testified credibly that he ordered the siding reflected on Exhibit C1 on April 29, 2010, which makes sense given that the Plaintiff tendered the insurance check two days earlier.

[7] The word "PREPAID" on Exhibits C and C1 seems to refer to freight ("FRT") rather than the goods. Moreover, the type of sale on both invoices is listed as "POSCRED," which the court infers to mean "credit" at the "point of sale," with "Cash on Delivery" as indicated in the lower left hand of Exhibit C under "Terms." As the Plaintiff's counsel pointed out during cross-examination, Exhibit C shows an outstanding balance, suggesting that Vestal Builders did not pay for the windows when ordering them. Exhibit C1 includes similar references, except that the second page of the two page document was not offered into evidence, precluding the court from drawing any inference about prepayment.

Letter. *Id.*  The Defendant testified credibly that Block was no longer working on behalf Vestal Builders at the time, having been fired a week earlier, and that he was actively interfering with the business of Vestal Builders by enticing customers, including the Plaintiff, to sign agreements with a competing builder at a lower cost.[8]  The court notes that the Cancellation Letter does not state a reason for cancelling the Contract, but at the hearing the Plaintiff contended he cancelled because Vestal Builders did not "start" the job by May 6, 2010.  The court credits the Plaintiff's testimony that he cancelled the Contract, at least in part, because of what he perceived as the Defendant's delay in addressing the Plaintiff's urgent need for repairs.

Although Vestal Builders took some final measurements of the Plaintiff's home and apparently ordered windows and siding before May 6, 2010, it did not make any physical repairs to the Plaintiff's residence prior to his purported cancellation on May 7, 2010.  After receiving the Plaintiff's Cancellation Letter, the Defendant transferred the balance of the Security Deposit from the Vestal Builders checking account, which he described as a "trust" account, to his personal deposit account.  Furthermore, after consulting with counsel, Matthew DePerno, and despite the Plaintiff's repeated requests, the Defendant continued to withhold the Security Deposit, and did not use it in connection with the Plaintiff's project.

As justification at trial, the Defendant credibly testified that his counsel advised him that he was within his rights to keep "one-third of the current price" plus related expenses, or roughly the amount of the Security Deposit, as stipulated damages under paragraph 9 of the Contract. That provision does state that the home owner forfeits at least that amount if he "cancels, rescinds, or otherwise terminates [the] contract after the expiration of the applicable cancellation

---

[8] The Defendant also testified credibly that he sought and obtained a restraining order from the Kalamazoo County Circuit Court against Block and others, evidently premised on a breach of a non-compete agreement.

period . . . ." *See* Exh. A2, at 2. The Defendant and his counsel evidently regarded the Plaintiff's termination of the Contract as wrongful (or at least untimely).

Finally, in the Third Pretrial Order, Judge Hughes also established the following facts for purposes of this proceeding:

1. The Plaintiff contracted with Vestal Builders to repair storm damage to his home;

2. The Defendant is the owner of Vestal Builders and the person responsible for making decisions on behalf of Vestal Builders;

3. The Plaintiff paid Vestal Builders $8,645.00 as the Security Deposit;

4. Vestal Builders did not perform the work;

5. Vestal Builders did not return the Security Deposit.

*See, generally,* Exh. 1; Fed. R. Civ. P. 16(c)(2) (matters for consideration at pretrial conferences).

## IV. CONCLUSIONS OF LAW

### A.    Michigan Building Contract Fund Act and § 523(a)(4)

The Plaintiff's complaint relies principally on § 523(a)(4) and the MBCFA, M.C.L. § 570.151, *et seq.* Until recently, the bench and bar within our state generally assumed that proving a violation of the MBCFA sufficiently established "fraud or defalcation while acting in a fiduciary capacity" for purposes of excepting the resulting debt from discharge under § 523(a)(4). *See Shafer Redi-Mix v. Craft (In re Craft)*, 414 B.R. 165 (W.D. Mich. 2009); *Kriegish v. Lipan (In re Kriegish)*, 275 B.R. 838, 844 (E.D. Mich. 2002), *aff'd*, 97 Fed. Appx. 4 (6th Cir. 2004). Indeed, the Sixth Circuit has defined "defalcation" in this context to include the "failure to properly account for" funds held in trust. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005).

Courts, including this court, routinely relied on the burden-shifting framework set forth in *Cappella v. Little (In re Little)*, 163 B.R. 497, 500-01 (Bankr. E.D. Mich. 1994), holding that once the creditor-plaintiff establishes a statutory trust under the MBCFA by proving the defendant-contractor's receipt of a building contract fund, the defendant then bears the burden of accounting for the funds received, and establishing that he did not use them for any purpose other than to first pay laborers, subcontractors, and material suppliers. The court in *Little* developed this framework based on state law, including the law governing fiduciaries and the assignment of burdens of proof.

In the court's experience, many debtors who run small construction companies readily concede their shortcomings in running a business, in general, and keeping records, in particular. The Defendant made a similar concession at trial.  Such debtors are often unaware of their fiduciary duties, and in any event unable to "account for" the funds impressed with the statutory trust under the MBCFA.  Consequently, they suffer judgment excepting their construction business debts from discharge because the courts invariably treat their failure to account for trust funds as "defalcation" under § 523(a)(4). *Blaszak*, 397 F.3d at 390.

The United States Supreme Court, however, recently opined in *Bullock v. Bankchampaign, N.A.*, 133 S. Ct. 1754 (2013), that "defalcation" as used in § 523(a)(4) connotes a state of mind or *scienter* that involves "moral turpitude or intentional wrong." *Id.* at 1759.  In doing so, the court recognized a policy justification for easing burdens on "nonprofessional" trustees who seek protection in bankruptcy court. The court used the term "nonprofessional" twice in its opinion —signaling the term's importance— including in the following passage:

> In the absence of fault, it is difficult to find strong policy reasons favoring a broader exception here, at least in respect to those whom a scienter requirement will most likely help, namely *nonprofessional* trustees, perhaps

administering small family trusts potentially immersed in intrafamily arguments that are difficult to evaluate in terms of comparative fault.

*Id.* at 1761 (emphasis in original).  Significantly, the debtor-defendant in *Bullock* clearly engaged in self-dealing by borrowing from a family trust while serving as trustee.  Although a state court concluded that the defendant in *Bullock* did not have "a malicious motive in borrowing funds from the trust," the same court found that he had committed a breach of fiduciary duty.  After exhausting efforts to repay the improper gains, the now-displaced trustee sought protection under the Bankruptcy Code, but the successor trustee filed an adversary proceeding to except the debt from discharge.  The Bankruptcy Court, the District Court on appeal, and the Court of Appeals on further appeal, concluded that the debtor's conduct amounted to defalcation under § 523(a)(4).  *See Bullock*, 133 S. Ct. at 1758.  Despite the clear findings by the state and federal courts that the debtor breached his fiduciary duty, the Supreme Court nevertheless remanded, signaling that mere breach of fiduciary duty may not amount to "defalcation" under § 523(a)(4).

Although the Court decided this issue in the context of a trustee's breach of a father's testamentary trust, the holding applies equally to a debtor's breach of the statutory trust under the MBCFA.  The Supreme Court further explained that:

> "[W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.

*Bullock*, 133 S. Ct. at 1759 (citations omitted).  After *Bullock*, a plaintiff who relies on the MBCFA to except a debt from discharge must therefore establish more than a breach of a

fiduciary duty or a right to relief under the state statute; he must also establish under the federal statute —§ 523(a)(4)— that the defendant knew that his conduct was improper, or disregarded "'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.*

Applying that requirement to the present adversary proceeding, the court credits the Defendant's testimony that he believed he was justified in retaining the Security Deposit under the terms of the Vestal Builders preprinted business form, and that acting on this belief under the circumstances did not involve an intentional wrong or gross recklessness. In other words, the Plaintiff has not met his burden of proving that the Defendant knew his retention of the Security Deposit was improper.[9] Similarly, the court credits the Defendant's testimony that he consulted with counsel, who agreed with the Defendant's interpretation of the Contract and the Plaintiff's actions. Regardless of the soundness of counsel's advice, and regardless of whether such justification would relieve a builder of the duty to return the building contract fund as a matter of state statute, a nonprofessional trustee who consults counsel and follows counsel's advice cannot justly be regarded as disregarding "'a substantial and unjustifiable risk' that his conduct [would] turn out to violate a fiduciary duty." *Bullock*, 133 S. Ct. at 1759. Such a trustee may have a debt arising under state law (for example, if he is mistaken about his duty), but the debt may nevertheless be discharged if he is not sufficiently culpable under federal law.

The court finds the Defendant was not reckless in refusing to return the Security Deposit given his and his counsel's colorable view that the Plaintiff improperly terminated the Contract and suffered forfeiture as a result. The court makes this finding regardless of whether Exhibits A1 and A2 or Exhibit B represents the final expression of the parties' agreement. No matter

---

[9] More than two years ago, during a state court deposition, the Defendant similarly testified about his reasons for retaining the Security Deposit. *See* Exh. 3 at 43:16-25 (Transcript of Deposition of Matthew Paul Vestal conducted Jan. 26, 2012).

which version of the Contract the parties were performing under, the court is convinced that the Defendant actually believed (1) he had "started" working on the project before May 6, 2010 (by making final measurements and placing the order for supplies necessary to start the actual physical labor under the Contract); and (2) the Plaintiff could not cancel the Contract as he did, without incurring liquidated damages under the Contract.

Accordingly, the Plaintiff has not established a right to have his claim excepted from discharge under 11 U.S.C. § 523(a)(4).

B.      Conversion and § 523(a)(6)

The court's finding with respect to the Defendant's *scienter* similarly disposes of the Plaintiff's conversion-based claim under § 523(a)(6). *See McCallum v. Pixley (In re Pixley),* 456 B.R. 770, 778-79 (Bankr. E.D. Mich. 2010) (noting that technical conversions actionable under state law do not necessarily rise to the level of "willful and malicious" injury under § 523(a)(6)).

Accordingly, the Plaintiff has not established a right to have his claim excepted from discharge under 11 U.S.C. § 523(a)(6).

## IV. CONCLUSION

The Plaintiff understandably assumed that proving the elements of a case under the MBCFA would entitle him to relief under § 523(a)(4), because that seemed to be true before the Supreme Court's *Bullock* opinion. But, just as a person can commit a technical *conversion* under Michigan law without causing the debt to be excepted from discharge under § 523(a)(6), *see Pixley,* 456 B.R. at 778-79, so too may a debtor violate the MBCFA without necessarily turning the debt into one that survives discharge. Because the policy of the state statute differs from the federal policy favoring discharge, proving a state law claim under MBCFA or a case for state law conversion may be a necessary but not sufficient step in winning a judgment excepting the

debt from discharge under bankruptcy law.  As the Supreme Court explained in *Bullock*, the policy favoring discharge requires a "heightened standard" going beyond mere proof of a breach of fiduciary duty, especially in cases involving nonprofessional trustees.  State law, naturally, addresses separate concerns.

The Clerk will prepare a separate judgment, as required by Fed. R. Bankr. P. 9021, denying the Plaintiff's request for a determination that the claim is excepted from discharge under 11 U.S.C. § 523(a)(4) and (a)(6).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall prepare a judgment dismissing the Plaintiff's complaint with prejudice, with each party to bear his own costs.

IT IS FURTHER ORDERED that the Clerk shall serve this Opinion and the judgment upon Matthew Vestal by first class United States Mail, and upon Cody Knight, Esq., and the United States Trustee pursuant to the court's CM-ECF system.

[END OF ORDER]

**IT IS SO ORDERED.**

**Dated February 11, 2014**



_____

Scott W. Dales
United States Bankruptcy Judge